UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Plaintiffs Koninklijke Philips N.V. , Philips North America LLC, Philips Medical Systems MR, Inc., Philips Medical Systems Nederland B.V., and Philips Healthcare (Suzhou) Co., Ltd.,<br><br>                Plaintiffs<br><br>   v.<br><br>Midea Group Co., Ltd.,<br><br>                Defendant | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Koninklijke Philips N.V., Philips North America LLC, Philips Medical Systems MR, Inc., Philips Medical Systems Nederland B.V., and Philips Healthcare (Suzhou) Co., Ltd., (collectively, "Philips" or "Plaintiffs") by their attorneys, for their Complaint against Defendant, Midea Group Co., Ltd. ("Defendant" or "Midea Group"), allege as follows:

## THE PARTIES

1. Plaintiff Koninklijke Philips N.V. (f/k/a Koninklijke (Royal) Philips Electronics N.V.) ("KPNV") is a corporation organized and existing under the laws of the Netherlands with its headquarters in Amsterdam, the Netherlands.

2. Plaintiff Philips North America LLC is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 222 Jacobs Street, Cambridge, Massachusetts.

3. Philips Medical Systems Nederland B.V. is corporation organized under the laws

of the Netherlands with its principal place of business at Veenpluis 6, Best, Netherlands.

4. Plaintiff Philips Medical Systems MR, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 450 Old Niskayuna Road, Latham, New York.

5. Philips Healthcare (Suzhou) Co., Ltd. is an entity organized and existing under the laws of the Peoples' Republic of China, with its principal place of business at No. 258 Zhongyuan Road, Suzhou Industrial Park, Suzhou City, China.

6. Plaintiffs Philips North America LLC, Philips Medical Systems MR, Inc., Philips Medical Systems Nederland B.V., Philips Healthcare (Suzhou) Co., Ltd., are commonly owned by Koninklijke Philips N.V. (all plaintiffs collectively, "Philips").

7. Philips is engaged in the business of research, development, and commercialization of medical imaging technology, including cutting edge magnetic resonance imaging ("MRI") machines and components, in addition to other, unrelated products and/or services.

8. On information and belief, Midea Group Co., Ltd. ("Midea Group") is a business entity organized under the laws of the People's Republic of China, with its headquarters in Foshan, China.

9. On information and belief, Midea Group operates in the United States through its wholly-owned subsidiary, Midea America Corporation, which is incorporated under the laws of the State of Florida with its headquarters at 300 Kimball Drive, Parsippany, New Jersey.

10. On information and belief, Midea Group, through its Midea Corporate Research Center – Medical Device Research Center is in the business of commercializing, among other products, medical diagnostic imaging equipment, including MRI machines and components,

including but not limited to superconducting magnets.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that a cause of action arises under federal law – the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between a citizen of this State and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the Massachusetts state law claims asserted herein pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Midea Group at least because certain of the acts complained of herein occurred in Massachusetts, including knowingly engaging in one or more acts in furtherance of the trade secret misappropriation alleged herein being directed to and occurring in the Commonwealth of Massachusetts.

13.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to Philips' claims occurred in this district, including Defendants' acts constituting trade secret misappropriation, as further alleged below.

## BACKGROUND

14.     Philips is a world leader is precision diagnostics technology, including in MRI, including the research, development and commercial manufacture of MRI systems and components, including the superconducting electromagnet systems that are the heart of such products.

15.     Through years of research and development and manufacturing experience, Philips has developed proprietary component specifications and manufacturing and assembly

3

techniques, processes and procedures (collectively, the "Philips MR Trade Secrets"), including but not limited to:

- Superconducting magnet coil component specifications and manufacturing tooling and techniques, including but not limited to the structure and properties of superconducting wire; composition, preparation, and application of the binding agent; and the techniques, processes, and tooling used for manufacture, including but not limited to winding the superconducting magnet coils;

- Magnet persistent current switch ("MPCS") specifications and component and manufacturing tooling and techniques, including but not limited to the structure and properties of superconducting wire; composition, preparation and application of the binding agent; and the techniques, processes, and tooling used for manufacture;

- Current limiters, including the B0 current limiter ("B0") specifications and component and manufacturing tooling and techniques, including but not limited to the structure and properties of superconducting wire; composition, preparation, and application of the binding agent; and the techniques, processes, and tooling used for manufacture;

- Shielded gradient coil component design and specifications;

- Heat exchanger component specifications and manufacturing tooling, techniques, and assembly procedures; and

- Energization and discharge and lead system and HTS lead specifications and component and manufacturing tooling and techniques;

16. Among the Philips MR Trade Secrets are Philips' proprietary specifications for the superconducting wires used in PCS switches and B0 current limiters.

17. Each of the Philips MR Trade Secrets and the compilation comprising the Philips MR Trade Secrets is valuable because each of the Philips MR Trade Secrets and the compilation comprising the Philips MR Trade Secrets provides Philips with a competitive advantage because they are not generally known.

18. The Philips MR Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

19. Philips spent considerable time and resources developing, refining and/or compiling the Philips MR Trade Secrets.

20. The Philips MR Trade Secrets are critical components used in the production of certain Philips magnets and MR imaging machines. The Philips MR Trade Secrets are the result of years and millions of dollars of research and development work to optimize product design and manufacturing specifications and techniques.

21. If even possible, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the Philips MR Trade Secrets, and it is unlikely that the Philips MR Trade Secrets could be replicated at all without access to Philips' trade secrets and other confidential business information.

22. The Philips MR Trade Secrets relate to MRI and technology products used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

23. At all relevant times, Philips has taken reasonable measures to maintain the secrecy of its MR-related trade secrets and other confidential business information, and has not

granted permission to reproduce, use, or disclose, in whole or in part, such trade secret and other confidential business information.

24. Philips employed at least industry-standard security practices though its promulgation and enforcement of internal security policies prohibiting disclosure of and restricting access to Philips' confidential information, including the Philips MR Trade Secrets. Philips made considerable additional efforts to maintain the secrecy of the Philips MR Trade Secrets, including but not limited to: (1) restricting access and requiring password protection to access Philips' systems containing the Philips MR Trade Secrets; (2) granting only certain personnel at Philips facilities engaged in the research and development and manufacturing of MRI systems authorized access documentation regarding the Philips MR Trade Secrets; (3) requiring employees with access to the Philips MR Trade Secrets to be bound to confidentiality obligations, including those as set forth in employment agreements, Philips' General Business Principles and the Philips "Simply Right" Employee Handbook ("Employee Handbook"); and (4) requiring departing employees, to return all materials relating to Philips' business – including trade secret, proprietary, and/or confidential materials – upon termination, i.e., as set forth in the Employee Handbook.

25. All Philips personnel with access to documentation and/or use of the Philips MR Trade Secrets have been and are subject to contractual obligations of confidentiality, including induvial employment agreements and/or adherence to Philips Global Business Principles ("GBP"). GPB require annual compliance training, and provide, among other things, that:

> We protect Philips' assets and resources, including trade secrets and proprietary information, against illegal, unauthorized or irresponsible use . . . [and] [w]e safe guard our patents, trademarks, copyrights, trade secrets and other forms of intellectual property against unauthorized use or improper disclosure.

26. In addition, the Philips Employee Handbook, to which Philips employees with

access to the Philips MR Trade Secrets were and are required to acknowledge and agree, imposes additional obligations that such employees "[c]onduct business in strict compliance with applicable laws and according to company policies and guidelines."

27. The Employee Handbook further reinforced such employees' obligations of confidentiality and restrictions on the use of Philips electronic communications and information systems, stating:

- "**Confidential and proprietary information is information which gives the company a competitive advantage and is not generally known by outside individuals. This includes data about research, operations, products, plans, strategies, manufacturing, marketing, finances, employees, and customers, suppliers and business partners**." (emphasis added)

- "**It is unethical and illegal for you to use Philips information for personal gain**. Do not discuss confidential company business with anyone outside the company, including family and friends. Limit the distribution of confidential material to those who must know about it. Keep important papers locked up and keep letters and memos out of view." (emphasis added)

- "Good laptop and computer security practices are necessary to ensure that personal or sensitive data and Philips confidential information are protected."

28. The superconducting wires used in PCS switches and B0 current limiters were developed in Massachusetts specifically for Philips and are produced as custom products for Philips in Massachusetts. On information and belief, at least the B0 current limiter superconducting wire is not supplied by Philips' supplier to any customer other than Philips.

29. All vendors and suppliers, including suppliers of the superconducting wires used

in PCS switches and B0 current limiters with access to any of Philips MR Trade Secrets, in whole or in part, were and remain at least subject to Philips General Conditions of Purchase ("GCP"), which require:

> 11. Ownership and Intellectual Property
>
> 11.1. All machinery, tools, drawings, specifications, raw materials and any other property or materials furnished to Supplier by or for Philips, or paid for by Philips, for use in the performance of the Agreement, shall be and remain the sole exclusive property of Philips and shall not be furnished to any third party without Philips' prior written consent, and all information with respect thereto shall be confidential and proprietary information of Philips. In addition, any and all of the foregoing shall be used solely for the purpose of fulfilling orders from Philips, shall be marked as owned by Philips, shall be held at Supplier's risk, shall be kept in good condition in safe storage and, if necessary, shall be replaced by Supplier at Supplier's expense, shall be subject to periodic inventory check by Supplier as reasonably requested from time to time by Philips, and shall be returned promptly upon Philips' first request. Except as otherwise expressly agreed in writing, Supplier agrees to furnish at its own expense all machinery, tools, and raw materials necessary to perform its obligations under the Agreement.
>
> ***
>
> 11.4. Philips shall retain all rights in any samples, data, works, materials and intellectual and other property provided by Philips to Supplier. All rights in and titles to the Work Product shall become Philips' property. Supplier shall execute and deliver any documents and do such things as may be necessary or desirable in order to carry into effect the provisions of this Clause 11.4.
>
> ***
>
> 11.6. Supplier shall not, without Philips' prior written consent, publicly make any reference to Philips, whether in press releases, advertisements, sales literature or otherwise.
>
> ***
>
> 16. Information Security
>
> 16.1 Ownership of the Philips Information shall remain with Philips and its Affiliates. Supplier may use the Philips Information only for the performance of the Agreement and in accordance with Philips' instructions. Supplier shall clearly mark the Philips Information as property of Philips.
>
> 16.2 Supplier shall establish an information security management framework to

initiate and control the implementation of security policies, standards and procedures within Supplier's organization in order to protect Philips Information and assets relevant to the Agreement (including any systems). Such framework shall be operated in accordance with Good Industry Practices and shall at a minimum include protection against loss, deterioration, corruption, unauthorized alteration and unauthorized access. Supplier shall protect Philips Information and assets based on the principles of confidentiality, integrity and availability.

***

22. Confidentiality

22.1. Supplier shall treat all information provided by or on behalf of Philips or generated by Supplier for Philips under the Agreement as confidential. All such information shall be used by Supplier only for the purposes of the Agreement. Supplier shall protect Philips' information using not less than the same degree of care with which it treats its own confidential information, but at all times shall use at least reasonable care. All such information shall remain the property of Philips and Supplier shall, upon Philips' demand, promptly return to Philips all such information and shall not retain any copy thereof.

22.2. The existence and the contents of the Agreement shall be treated as confidential by Supplier.

30.     In addition, specifications for certain components, including, for example, the superconducting wire for PCS switches and B0 current limiters included the following language on each page of the specification: "**Proprietary Notice:** This document is property of Philips Medical Systems MR, Inc. (PMSMR) and shall not, with out the express written permission of PMSMR, be reproduced or copied in whole or in part by any person outside of PMSMR, or if loaned by PMSMR to such person, shall not be used for furnishing information to any third party or for any purpose other than that for which is it loaned."

31.     Philips has taken additional reasonable measures to maintain the secrecy of the Philips MR Trade Secrets and other confidential business information, and has not granted permission to reproduce, use, or disclose, in whole or in part, such trade secret or other confidential business information.

**Midea Group's Misappropriation of the Philips MR Trade Secrets**

32. On or about June 27, 2023, Jessie (Ge Jinhan) gejh@midea.com sent an email to a Philips superconducting wire supplier located in Massachusetts (the "PSCW Massachusetts Supplier"), with the subject line (translated from Chinese to English), "Purchase Inquiry for Superconducting Wire." The body of the email, (translated from Chinese to English), stated:

-----Original Message-----
From: Jessie 葛津含 <gejh11@midea.com>
Sent: Tuesday, June 27, 2023 10:08 PM
To: ▇
Subject: 超导线采购询价

Hi, 您好

我是美的集团-中央研究院-医疗器械研究院-Jessie 葛津含。现有采购需求如附件。
我的微信：13281159019. Feel free to contact!

Looking forward to your reply.

Regards,
Jinhan

***

-----Original Message-----
From: Jessie (Ge Jinhan) <gejh11@midea.com>
Sent: Tuesday, June 27, 2023 10:08 PM
To: ▇
Subject: Purchase Inquiry for Superconducting Wire

Hi,

My name is Jessie (Ge Jinghan) from Midea Group - Midea Corporate Research Center - Medical Device Research Center. We have a purchase demand as detailed in the attachment.
My WeChat ID: 13281159019. Feel free to contact!

Looking forward to your reply.

Regards,

Jinhan

33.     That email had three attachments, two of which were entitled "B0 SC Wire Spec.pdf," and "MPCS SC Wire Spec.pdf," each of which was transmitted to and disclosed in Massachusetts by Midea Group.

34.     The PSCW Massachusetts Supplier then contacted Philips, forwarding the June 27, 2023 email, stating "[h]ere is the original email inquiry with the sections cut from your specs," identifying the specification in the B0 SC Wire Spec.pdf as "your B0 Current limited P/N 4598-007-14461" and the specification in the MPCS SC Wire Spec.pdf as "similar to your PCS wire P/N/ 4535-010-22731 (Spec 500612)," noting that, while a different diameter than supplied to Philips's factory in the United States, the bare diameter matched the diameter of the MPCS wire "we supplied to Philips China (2021) . . . ."

35.     In an email dated July 13, 2023, the General Manager of PSCW Massachusetts Supplier stated that "[t]hese two parts have only been supplied to Philips USA and Philips China, and both have been developed specifically for Philips by [Supplier].  If this is not a requirement for Philips China, I am concerned that your intellectual property may have been compromised."

36.     The B0 SC Wire Spec.pdf and MPCS SC Wire Spec.pdf specifications provide at least sixteen different "Requirements," each with corresponding "Standard."

37.     The compilation of each of the at least sixteen requirements and standards listed in the specification for the B0 SC Wire Spec.pdf sent by Midea Group to the PSCW Massachusetts Supplier is identical to the Philips specification, but for one apparent typographical error.

38.     Similarly, the compilation of each of the at least sixteen requirements and standards listed in the specification for the MPCS SC Wire Spec.pdf sent by Midea Group to the PSCW Massachusetts Supplier is substantively identical to (or at least overlapping with) the

11

Philips Latham specification but for the "Bare Diameter," which while slightly different from the Philips Latham specification, matches the specification ordered from the PSCW Massachusetts Supplier by Philips' Suzhou factory in 2021.

39. On information and belief, specifications disseminated by Midea Group for the PCS switches and B0 current limiters superconducting wires are substantially identical to those Philips had implemented for Philips' PCS switches and B0 current limiters superconducting wires.

40. This PSCW Massachusetts Supplier of the superconducting wires for PCS switches and B0 current limiters is not publicly known to be the supplier of the PCS or B0 wire for Philips, nor would its identity be discoverable from destructive or other disassembly of a Philips superconducting magnet.

41. On information and belief, the specifications and tolerances transmitted by Midea Group to Philips PSCW Massachusetts Supplier could not have been derived by lawful means and were unlawfully obtained from Philips' trade secret and other confidential business information, including the Philips MR Trade Secrets.

42. Thus, on information and belief, Midea Group acquired, without authorization, Philips' Philips MR Trade Secrets, including, for example, specifications for the superconducting wires for PCS switches and B0 current limiters specifications.

43. On information and belief, Midea Group hired and/or directed the hiring of one or more Philips employees because they had access to and/or intimate knowledge of the Philips MR Trade Secrets, including but not limited to the specifications for the superconducting wires for PCS switches and B0 current limiters.

44. The specifications for the superconducting wires for PCS switches and B0 current

limiters are not publicly known and one would not be able to reverse engineer the internal workings, the logic behind their electrical, chemical, and physical workings, or other features that differentiate critical attributes of the Philips superconducting magnets in the market.

45. The trade secret specifications for the superconducting wires for PCS switches and B0 current limiters in documents misappropriated by Defendants, would provide Midea Group with a significant head start in commercializing a knock-off of Philips MRI products and technology.

46. On information and belief, Midea Group is using and/or directing the use of other Philips' trade secrets and other confidential business information unlawfully misappropriated from Philips to rapidly advance their commercialization of MR magnet technology.

47. Information on Philips' designs, design history, specifications, and manufacturing techniques cannot be revered engineered from a sample superconducting MRI magnet. For example, the materials, circuitry, controls, and other features of the design were refined over years of development and commercial use. On information and belief, without having misappropriated trade secrets and other confidential business information relating to aspects of design, design logic, and process controls, including Philips MR Trade Secrets, Midea Group would not have been able to so rapidly progress in its development of commercial MR magnet technology.

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)

48. Philips repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

49. The Philips MR Trade Secrets, including but not limited to the specifications and tolerances for the PCS and B0 superconducting wires are trade secrets under the Defend Trade

13

Secrets Act ("DTSA"), 18 U.S.C. § 1836.

50. The MR Philips Trade Secrets were not known to anyone outside of Philips, except persons or entities bound to stringent confidentiality obligations.

51. On information and belief, Midea Group obtained at least the trade secret specifications and tolerances for the PCS and B0 superconducting wires from one or more former employees of Philips, who were and remain bound by obligations of confidentiality and non-use for such information.

52. If even possible without the disclosure of the Philips MR Trade Secrets, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the Philips MR Trade Secrets, and it is unlikely that the Philips MR Trade Secrets could be replicated at all without access to Philips trade secret and other confidential business information.

53. The Philips MR Trade Secrets relate to medical imaging and technology products used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate commerce in the United States and in the Commonwealth of Massachusetts and/or in foreign commerce.

54. At least the specifications and tolerances for the PCS and B0 superconducting wires were developed for Philips in Massachusetts, and unlawfully transmitted by Midea Group to the PSCW Massachusetts Supplier in Massachusetts.

55. The Philips MR Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

56. Philips spent considerable time and resources developing, refining, and/or compiling the Philips MR Trade Secrets.

57. Philips has taken reasonable measures to maintain the secrecy of its trade secrets

and other confidential business information, including the Philips MR Trade Secrets, and has not granted permission to reproduce, use, or disclose, in whole or in part, such trade secret and other confidential business information.

58. Midea Group misappropriated at least some of the Philips MR Trade Secrets, including at least the specifications and tolerances for the PCS and B0 superconducting wires, by using such information to provide specifications to third party manufacturers, including the PSCW Massachusetts Supplier, and by attempting to commercially exploit the Philips MR Trade Secrets in competition with Philips.

59. Midea Group further acquired and exploited at least the Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires by improper means and used the improperly acquired Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires for their own commercial benefit and to compete with Philips.

60. Midea Group's acts identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the DTSA.

61. As a direct result of Midea Group's wrongdoing, Philips was damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

62. Midea Group knowingly, willfully, and maliciously misappropriated at least the Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires in a conscious disregard for Philips' rights and in a deliberate attempt to injure Philips' business and improve Defendants' business. Accordingly, Philips is entitled to recover attorney's fees, actual, and exemplary damages in an amount to be determined at trial.

63. In addition to the pecuniary harm already suffered, Philips has suffered and will continue to suffer irreparably harm by Midea Group's continuing misappropriation.

64. The business advantage, value, and goodwill earned by Philips through the development and lawful exploitation of the Philips MR Trade Secrets, including at least the specifications and tolerances for the PCS and B0 superconducting wires, will be lost forever by way of Midea Group's continuing misappropriation, and such harm will continue absent an injunction requiring Midea Group to return and cease and desist from any use of the Philips MR Trade Secrets. Philips is thus entitled to injunctive relief against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(A).

### COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE MASSACHUSETTS UNIFORM TRADE SECRETS ACT (G.L. CH. 93 § 42A)

65. Philips repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

66. The Philips MR Trade Secrets, including but not limited to the specifications and tolerances for the PCS and B0 superconducting wires are trade secrets under the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. Laws ch. 93, § 42A.

67. The MR Philips Trade Secrets were not known to anyone outside of Philips, except persons or entities bound to stringent confidentiality obligations.

68. On information and belief, Midea Group obtained at least the trade secret specifications and tolerances for the PCS and B0 superconducting wires from one or more former employees of Philips, who were and remain bound by obligations of confidentiality and non-use for such information.

69. If even possible without the disclosure of the Philips MR Trade Secrets, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the Philips MR Trade Secrets, and it is unlikely that the Philips MR Trade Secrets could be replicated at all without access to Philips trade secret and other confidential business information.

16

70. The Philips MR Trade Secrets relate to medical imaging and technology products used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

71. At least the specifications and tolerances for the PCS and B0 superconducting wires were developed for Philips in Massachusetts, and unlawfully provided by Midea Group to the PSCW Massachusetts Supplier in Massachusetts.

72. The Philips MR Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

73. Philips spent considerable time and resources developing, refining, and/or compiling the Philips MR Trade Secrets.

74. Philips has taken reasonable measures to maintain the secrecy of its trade secrets and other confidential business information, including the Philips MR Trade Secrets, and has not granted permission to reproduce, use, or disclose, in whole or in part, such trade secret and other confidential business information.

75. Midea Group misappropriated at least some of the Philips MR Trade Secrets, including at least the specifications and tolerances for the PCS and B0 superconducting wires, by using such information to provide specifications to third party manufacturers, including the PSCW Massachusetts Supplier, and by attempting to commercially exploit the Philips MR Trade Secrets in competition with Philips.

76. Midea Group further acquired and exploited at least the Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires by improper means and used the improperly acquired Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires for their own commercial benefit and to compete with Philips.

77. Midea Group's acts identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the MUTSA.

78. As a direct result of Midea Group's wrongdoing, Philips was damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

79. Midea Group knowingly, willfully, and maliciously misappropriated at least the Philips MR Trade Secrets specifications and tolerances for the PCS and B0 superconducting wires in a conscious disregard for Philips' rights and in a deliberate attempt to injure Philips' business and improve Defendants' business. Accordingly, Philips is entitled to recover attorney's fees, actual, and exemplary damages in an amount to be determined at trial.

80. In addition to the pecuniary harm already suffered, Philips has suffered and will continue to suffer irreparably harm by Midea Group's continuing misappropriation.

81. The business advantage, value, and goodwill earned by Philips through the development and lawful exploitation of the Philips MR Trade Secrets, including at least the specifications and tolerances for the PCS and B0 superconducting wires, will be lost forever by way of Midea Group's continuing misappropriation, and such harm will continue absent an injunction requiring Midea Group to return and cease and desist from any use of the Philips MR Trade Secrets. Philips is thus entitled to injunctive relief against Defendants pursuant to G.L. ch. 93, §42A.

## COUNT III – UNJUST ENRICHMENT

82. Midea Group's misappropriation of Philips' trade secret and confidential business information has conferred a significant benefit on Midea. Among other things, Midea Group has saved a considerable amount of effort, time, expense, and expertise by misappropriating Philips' confidential, proprietary, and/or trade secret information.

83. On information and belief, Midea Group received Philips MR Trade Secrets and other Philips' confidential business information.

84. On information and belief, Midea Group has unjustly retained, used, exploited, and/or otherwise benefitted from the Philips MR Trade Secrets and other Philips confidential business information.

85. The Philips MR Trade Secrets unjustly retained, used, and/or exploited, on information and belief, by Midea Group have unjustly conferred a valuable benefit on Midea to the detriment of the Plaintiffs.

86. Retaining, using, exploiting, and/or otherwise benefitting from the Philips MR Trade Secrets and other Philips' confidential business information by Midea Group would violate the fundamental principles of justice, equity, and good conscience.

87. Philips is thus entitled to damages for Midea Group's unjust enrichment, including but not limited to, monetary damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Philips respectfully prays that this Court:

(a) Enter judgment on all counts in favor of Philips;

(b) Enter a worldwide permanent injunction against Mide Group a from using, accessing, disclosing, or distributing any Philips' confidential or proprietary information and/or trade secrets, including but not limited to the Philips MR Trade Secrets;

(c) Enter a permanent injunction against Midea Group to return all documents, files, programs, data, metadata, and other information of any kind constituting or containing Philips trade secret or confidential business information, preserved, without alteration, deletion, or spoliation, together with any and all copies of any of the foregoing in any

medium or format including but not limited to their personal computers, drop box accounts, and the like;

(d) Enter a permanent injunction against Midea Group requiring them to return all Philips' confidential or proprietary information and/or trade secrets, and Philips' property in their possession, custody, or control;

(e) Award money damages to Philips in an amount to be determined at trial, plus interest, costs, and disbursements;

(f) Award Philips exemplary damages of twice the amount awarded as general damages for the first and second causes of action for misappropriation of trade secrets;

(g) Award Philips its attorney's fees and costs incurred in bringing and prosecuting this action; and

(h) Granting Philips such additional and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all matters so triable.

Respectfully Submitted,

/s/ Adam P. Samansky
Adam P. Samansky
MA Bar No. 661123
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111
Tel: (617) 348-1810
Fax: (617) 542-2241
APSamansky@mintz.com

*Attorneys For Plaintiffs*